**In re Neal P. ROGAN, Debtor.**

**Tancy Jean Gemza, Plaintiff,**

v.

**Neal P. Rogan, Defendant.**

**Bankruptcy No. 98–34579.**
**Adversary No. 99–3006.**

United States Bankruptcy Court,
D. Connecticut.

Sept. 27, 2002.

---

James A. Curran, Danbury, Connecticut, for plaintiff.

Neal P. Rogan, Milford, Connecticut, pro se.

## MEMORANDUM OF DECISION ON COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBTS

ALBERT S. DABROWSKI, Bankruptcy Judge.

### I. INTRODUCTION

This adversary proceeding presents a question under Bankruptcy Code Section 523(a)(15) of the dischargeability of certain alleged obligations of the Debtor–Defendant to the Plaintiff—his former spouse. For the reasons stated more fully herein, the Court determines that some, but not all of the subject obligations are non-dischargeable debts in this bankruptcy case.

## II. JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over the instant proceeding by virtue of 28 U.S.C. § 1334(b); and this Court derives its authority to hear and determine this matter on reference from the District Court pursuant to 28 U.S.C. §§ 157(a), (b)(1). This is a "core proceeding" pursuant to 28 U.S.C. §§ 157(b)(2)(I).

## III. PROCEDURAL HISTORY

On October 16, 1998, the Debtor, Neal P. Rogan (hereafter, "Rogan"), commenced the instant bankruptcy case by the filing of a voluntary petition under Chapter 7 of the United States Bankruptcy Code. On January 8, 1999, the Plaintiff, Tancy Jean Gemza (hereafter, "Gemza"), initiated the instant adversary proceeding through the filing of a Complaint to Determine Dischargeability of Debt (hereafter, the "Complaint"), pursuant to Sections 523(a)(5) [1] and 523(a)(15). The Complaint was timely answered.[2]

Trial on the Complaint was conducted on June 21, 1999, at which time the Court admitted a number of exhibits and heard the testimony of, *inter alia*, Rogan, Gemza, and her parents—Theodore and Doris Gemza.

## IV. GENERAL FACTUAL BACKGROUND[3]

On or about April 8, 1998, the parties' 13-year marriage was dissolved by the Connecticut Superior Court for the Judicial District of Ansonia–Milford (Coppeto, J). The financial aspects of that dissolution were addressed by Judge Coppeto's Memorandum of Decision dated April 7, 1998 (hereafter, the "Decree").

The Decree ordered, *inter alia*, (i) that Rogan "hold [Gemza] harmless" from a certain "bill" from People's Bank (hereafter, the "Hold Harmless Obligation"); (ii) that Rogan "reimburse" Gemza the sum of $3,350.00 for certain debts that Gemza had paid or assumed (hereafter, the "Reimbursement Obligation"); and (iii) that Rogan "be responsible for one-half of the indebtedness owed to Gemza's father,[4] less a credit of $11,000 representing [Rogan's] one-half share of the equity in the marital home transferred to [Gemza]" pursuant to the Decree (hereafter, the "Family Obligation").[5]

Rogan and Gemza are young people in

---

1. At trial Rogan conceded the non-dischargeability of his "alimony" obligation of $800.00 per month pursuant to Code Section 523(a)(5). Given that concession, no issues under Section 523(a)(5) remain for the Court to determine.

2. The adversary proceeding file contains two essentially identical documents representing to be Rogan's Answer—Doc. I.D. Nos. 4 and 5, filed February 1 and 4, 1999, respectively.

3. This Section presents findings of fact deemed particularly relevant to the issues at bar. However, this presentation is not an exclusive recitation of the Court's findings of fact for purposes of Fed.R.Bank.P. 7052, as they may be found also in the Discussion Section of this Memorandum of Decision.

4. The Decree found that Gemza and Rogan were "jointly responsible for at least the sum of $55,000 which was advanced to the[m] ... by ... [Gemza's] father and evidenced by the promissory note signed by the[m]." The evidence at the trial of the instant proceeding established that the lender in this credit transaction was actually the Theodore Gemza Trust, not Gemza's father.

5. The evidence at trial established that Rogan's $11,000.00 "credit" against the Family Obligation was in fact paid to Gemza's father from the proceeds of Gemza's sale of the former marital residence.

apparent good physical health.[6] Gemza has earned a B.A. degree; Rogan holds a law degree, and is a licensed attorney at law. During their marriage, they assisted each other in their educational attainment and professional development.

At the time of trial each was unmarried and without dependents.[7] However, both were living beyond their means—a pattern established during the years of their marriage. The claimed current individual expenses for each exceeded by several hundred dollars their respective net incomes. The Court finds that in their presentation at trial, both parties "padded" their expenses to reflect a much more dire circumstance than actually existed at that time. In the case of Gemza however, the exaggeration went well beyond mere "padding." The Court finds that she and her parents participated in a dishonest reconstitution of certain gratuitous support into a claimed "loan" in excess of $40,000.00 (hereafter, the "Reconstituted Transfers").

During their marriage it was necessary for Gemza and Rogan to draw on resources unrelated to their current income to provide for the lifestyle which they chose. At that time they borrowed extensively from a trust established by Gemza's father (hereafter, the "Trust"). At the time of their separation, the principal amount of this debt had grown to approximately $55,000.00. After their separation, Rogan and Gemza continued to rely on the generosity of their respective families. Rogan borrowed approximately $21,000.00 in the aggregate from his siblings; and Gemza's parents provided her with at least

$45,000.00, inclusive of the Reconstituted Transfers.

At the time of trial Rogan was employed as an associate attorney at a mid-sized law firm in Connecticut. And while it is far from clear that he will ever join the ranks of partnership at his present firm, he is certain to advance in salary. Gemza too has the potential for income growth overtime, as she had just begun an administrative position with a new employer.[8] On balance, over a 10–year time frame, it would appear that Rogan's *potential* for substantial income growth is greater than Gemza's.

Gemza is a beneficiary of the Trust, which has a value not established on the record.[9] She also has a stock portfolio with a value of at least $10,000.00. In addition, she owns a 25% interest in a parcel of commercial real estate with a value of approximately $80,000.00.

## V. DISCUSSION

Congress has determined that under limited circumstances, individual creditors' interests in recouping certain classes of debts outweigh a debtor's interest in the unqualified fresh start implied by a general discharge. *See Grogan v. Garner,* 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). This is particularly true in the area of domestic obligations.

Since the advent of the Bankruptcy Code, Section 523(a)(5) has excepted from discharge debts arising from a divorce, separation agreement, or other such order of a court, owed "to a . . . former spouse . . . for alimony to, maintenance for, or

---

**6.** Rogan suffers from depression related to childhood trauma.

**7.** At that time though, Rogan was cohabitating with a female companion, and sharing expenses with her.

**8.** Gemza also has experience as a real estate agent.

**9.** Judge Coppeto explicitly found that Gemza came from a "well to do family".

support of such spouse . . . ." In 1994, Congress expanded the range of discharge exceptions for marital obligations through its enactment and codification of Section 523(a)(15), which provides in relevant part that—

(a) A discharge under section 727 . . . does not discharge an individual debtor from any debt—

\* \* \* \* \* \*

(15) not of the kind described in paragraph (5) [of Section 523(a)] that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, a determination made in accordance with State or territorial law by a governmental unit unless—

(A) the debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor and, if the debtor is engaged in a business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business; or

(B) discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse, or child of the debtor.

11 U.S.C. § 523(a)(15) (1998).

■ The *standard* of proof under Section 523(a)(15), as with other Section

523(a) dischargeability exceptions, is a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. at 291, 111 S.Ct. 654. However, the *allocation* of the *burden* of proof under Section 523(a)(15) is somewhat unique. A plaintiff/former spouse bears the initial burden of demonstrating (i) that there is a "debt" owed to her; (ii) that such debt was "incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement [or] divorce decree"; and (iii) that such obligation is "not of the kind described in . . . [Code Section 523(a)](5)." Upon a successful initial showing by the plaintiff, the burden then shifts to the debtor-defendant to prove either one of the dischargeability "safe harbors" provided by subparagraph (A) and (B) of Section 523(a)(15). *E.g., Matter of Crosswhite*, 148 F.3d 879 (7th Cir.1998); *Simon v. Murrell (In re Murrell)*, 257 B.R. 386, 389 (Bankr.D.Conn. 2001). In this manner the ultimate burden of persuasion may lie with the debtor-defendant.[10]

### A. The Plaintiff's Burden.

■ In the instant proceeding the Court concludes that Gemza has easily met her initial burden with respect to the Hold Harmless and Reimbursement Obligations. However, she has failed to establish that there is a debt owed to her from Rogan in connection with the Family Obligation. The language of the Decree is critical in this respect. It appears that the Decree is attempting to *allocate between the parties* a debt to a *third party* which theretofore was a *joint* obligation.[11] Although this

---

**10.** In this sense Section 523(a)(15) forms an exception to the general maxim that discharge exceptions are to be narrowly construed in favor of the debtor.

**11.** The pertinent language of the Decree states as follows:

Both parties are jointly responsible for at least the sum of $55,000 which was advanced to the parties by [Gemza's] father and evidenced by the promissory note signed by the parties.

[Rogan] shall be responsible for one-half of the indebtedness owed by the parties to [Gemza's] father, less a credit of $11,000

Court harbors some doubt that a dissolution court has the power to alter the nature of one or both spouses' relationships with a third party creditor, it need not resolve that question since it is clear that whatever the Superior Court was empowered to do, or attempted to do, it in fact did *not* create an obligation between the former spouses. Notably, in connection with the Family Obligation the Decree does not use the phrase, "hold harmless", or any other term plainly implying an obligation *between the former spouses,* even though the Superior Court demonstrated its propensity to do so in other parts of the Decree. *See, e.g.,* Decree at p. 6, *Real Estate,* p. 8, *Debts* ¶ 1. Accordingly, because Gemza has failed to satisfy her burden of proof under Section 523(a)(15), the Family Obligation is dischargeable in this bankruptcy case.

**B. The Defendant's Burden.**

The Court turns now to assess the adequacy of Rogan's proof with respect to the obligations as to which Gemza has met her initial burden—*i.e.* the Hold Harmless and Reimbursement Obligations. Due to the disjunctive language of Section 523(a)(15), Rogan can establish the dischargeability of those debts by meeting his burden of proof with respect to either subsection (A) *or* (B) of Section 523(a)(15).

*1. Section 523(a)(15)(A).*

Subsection 523(a)(15)(A) compels the Court to consider whether Rogan has "the ability to pay" the Hold Harmless and/or Reimbursement Obligation(s) "from income or property ... not reasonably necessary to be expended for ... [his] maintenance." Certainly, one could interpret the record in this proceeding to support Rogan's contention that *at the time of*

*trial* he had no excess income or property from which to satisfy the Hold Harmless and/or Reimbursement Obligation(s). Nonetheless, "ability to pay" under subsection (A) of Section 523(a)(15) is not a static concept, compelling its assessment at a fixed point in time such as the bankruptcy petition date, the time of the trial, etc. Rather, it is a fluid concept which permits the Court to consider a debtor's prior employment, future employment opportunities, health status, etc. to determine whether the future wealth and earning capacity of that debtor will be sufficient to allow for payment of the subject debt. *See, e.g., Hart v. Molino (In re Molino),* 225 B.R. 904, 908 (6th Cir. BAP 1998). To borrow an analogy, unlike the "rear view mirror" analysis which may apply to contests under Section 523(a)(5), the Court is compelled by Section 523(a)(15) to look out all of the windows of its vehicle. *See In re Dressler,* 194 B.R. 290, 300 (Bankr.D.R.I. 1996).

Upon a review of the record as a whole, the Court finds and concludes that given the totality of Rogan's life circumstances, he has the ability to pay the Hold Harmless and Reimbursement Obligations. The factors which have informed this determination include, but are not limited to the following: (i) Rogan's relatively young age and apparent good physical health; (ii) Rogan's substantial income in a prior career; (iii) Rogan's possession of a professional degree; (iv) the likelihood of a steady increase in Rogan's income within the legal profession; (v) Rogan's intention to pay family and other debts otherwise dischargeable in this bankruptcy case; (vi) the contributions of Rogan's live-in companion; (vii) the likelihood that Rogan's immense expenses for psychiatric treat-

---

representing his one-half share of the equity in the marital home transferred to [Gemza].

Decree at p. 8.

ment will eventually abate; and (viii) the relatively small dollar amount of the Hold Harmless and Reimbursement Obligations.

## 2. *Section 523(a)(15)(B).*

 An assessment of the facts under the standards of Subsections 523(a)(15)(B) is not an easy task. As the Seventh Circuit Court of Appeals has acknowledged, Section 523(a)(15) is a difficult provision to apply in practice, owing to its "jello-like" language. *Crosswhite*, 148 F.3d at 886. That amorphous quality is particularly true of Subsection (B).

■ In essence, Section 523(a)(15)(B) embodies a form of "balancing test" in which a debtor must prove by a preponderance of the evidence that the benefit to him of a discharge of the subject debt outweighs the resulting detriment that will be suffered by the former spouse if the indebtedness is deemed dischargeable. This equitable balancing test must be applied on a case-by-case basis and involves an examination of the *totality of the circumstances* involved in each case. There is no fixed laundry list of factors to be considered, and no fixed weight to be accorded to particular facts. And as with Subsection (A), the balance must be assessed by the court with an eye out all "windows", *i.e.* with an awareness of the parties' past, present and future economic attributes and prospects.

Upon a review of the totality of circumstances presented on the record of this proceeding, the Court finds and concludes that Rogan has failed to establish that discharging the Hold Harmless and/or Reimbursement Obligations would result in a benefit to him that outweighs the detrimental consequences to Gemza.

## VI. CONCLUSION

Based upon the foregoing, judgment shall enter in favor of the Plaintiff on the First Count of the Complaint, declaring the alimony obligation of the Decree non-dischargeable in the instant bankruptcy case. As to the Second Count of the Complaint, a judgment of non-dischargeability shall enter in favor of the Plaintiff with respect to the Hold Harmless and Reimbursement Obligations. In all further respects judgment shall be for the Defendant.